**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| YASER DAKHLALLAH, | ) | |
| | ) | |
| Plaintiff, | ) | No. 12 cv 8087 |
| | ) | |
| v. | ) | Hon. Marvin E. Aspen |
| | ) | |
| Justice Police Officer CPL. RYAN ZIMA, | ) | |
| and THE VILLAGE OF JUSTICE | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

MARVIN E. ASPEN, District Judge:

Presently before us is a motion for summary judgment filed by Defendants Ryan Zima and the Village of Justice as to all claims brought by Plaintiff Yaser Dakhlallah. Defendants contend that Plaintiff's claims for false arrest, unreasonable search, trespass, and malicious prosecution should be dismissed, as well as Plaintiff's request for punitive damages. For the reasons discussed below, we grant Defendants' motion for summary judgment in its entirety.

**BACKGROUND**

In May 2011, Lisa Aydin obtained from the Circuit Court of Cook County an order of protection that prohibited Plaintiff from contacting her and from taking, transferring, encumbering, concealing, damaging or otherwise disposing of her property. (RSOF ¶ 2.) Aydin then vacated that order of protection on June 14, 2011, but filed for a second order of protection against Plaintiff on February 21, 2012. (*Id.* ¶¶ 8–10.) In June 2012, Plaintiff and Aydin spoke

over the phone.  (RSOF ¶ 12.)  According to Aydin, Plaintiff called to ask her to "drop the restraining order" because of his "immigrant status" and to meet and provide him with a written, notarized statement.  (SOF ¶¶ 12–14, 30.)  Plaintiff disputes this fact, stating that he never told Aydin that she needed to drop the restraining order because there was no active restraining order against him on her behalf.  (RSOF ¶¶ 12–14.)  Plaintiff denies that the order of protection was active at the time, testifying that he wanted Aydin to provide a written statement admitting that she lied under oath when she obtained the order of protection against him and that the order of protection was "all lies."  (*Id.* ¶ 29.)  Regardless of the intended purpose of the meeting, the parties agree that on June 8, 2012, Aydin drove to Plaintiff's apartment at 8142 Thomas Street, Apartment 1-E, Justice, Illinois.  (*Id.* ¶¶ 1, 17.)  Plaintiff was living with his brother, Abdul-Aziz Aldakhlla, who at the time was 19-years-old and had been living in the U.S. on and off for four years.  (*Id.* ¶¶ 1, 81.)[1]

Although the parties dispute the sequence of events,[2] they agree that Aydin at some point entered Plaintiff's apartment, where Plaintiff's brother as well as his brother-in-law, Yasser Lakoud, were present, and worked on the statement for approximately two minutes before Aydin began screaming at Plaintiff.  (*Id.* ¶¶ 23, 31.)  Plaintiff then exited his apartment and called the Justice Police Department, telling the dispatcher that Aydin was "at his home screaming, fighting."  (*Id.* ¶ 33.)  Aydin, believing her cell phone to be missing, also called 911 after she left the apartment and told the operator that her "ex" had taken her cell phone.  (*Id*. ¶¶ 25–26.)

Defendant Corporal Ryan Zima and officer Joseph Bonkowski were dispatched to Plaintiff's apartment in response to a "domestic disturbance" call.  (*Id*. ¶¶ 34–35.)  Upon arrival,

---

[1] Abdul-Aziz also states in his deposition that he was 18 and one half-years-old.  (Aldakhlla Dep., SOF, Ex. F, 68:18.)

[2] The parties also agree that at some point Plaintiff and Aydin drove in the direction of Plaintiff's bank to have the document they prepared notarized, but never executed the plan.  (SOF, RSOF ¶¶ 19, 21.)

both officers approached Plaintiff, who was standing in a driveway adjacent to the apartment building, and asked for his identification, which Plaintiff provided. (*Id.* ¶¶ 37–38, 41.) Plaintiff told Zima that he had called the police because he was unsure if Aydin was going to come back to the apartment, and if she did, she had a history of attacking him, which he did not want to happen. (*Id.* ¶ 40.)

At some point, Aydin drove back to Plaintiff's apartment, and upon seeing that the police had arrived, got out of the car. (*Id.* ¶ 27.) Zima alleges, and Plaintiff denies, that Aydin began yelling at Plaintiff and accusing him of stealing her phone. (SOF, RSOF ¶¶ 42, 43.) Zima asked Aydin to produce identification and then ran her identification over to dispatch. (RSOF ¶ 44.) Aydin explained to Zima that when she started to leave Plaintiff's apartment, she realized that her phone was missing. (*Id.* ¶ 45.) Zima also alleges, and Plaintiff denies, that Plaintiff stated, "Look, I don't have her cell phone, check my car, check my house. You are not going to find anything. I don't have anything." (SOF, RSOF ¶ 47.)

Dispatch informed Zima that the Law Enforcement Agencies Data System ("LEADS") showed an active order of protection, naming Plaintiff as respondent and Aydin as petitioner, that barred Plaintiff from having contact with Aydin and from removing or concealing Aydin's property. (RSOF ¶¶ 48–49.) Zima instructed Plaintiff to turn around and place his hands behind his back, stating to Plaintiff that he was placing him into custody for violating a restraining order. (*Id.* ¶¶ 50–51.) He then placed Plaintiff in the backseat of the squad car. (*Id.* ¶ 53.) Plaintiff informed Zima that there was no active order of protection. (RSOF ¶ 52, RSAF ¶ 4.) Moreover, Plaintiff alleges, and Zima denies, that he told Zima that he had a paper showing that the order

had been vacated and that Aydin also told Zima "multiple times" that there was no active order of protection. (SAF, RSAF ¶¶ 4, 5.)[3]

After Zima placed Plaintiff in the squad car, he reviewed the information provided by LEADS. (RSOF ¶ 53.) The parties agree that the LEADS system showed that there was an active order of protection naming Plaintiff as respondent and Aydin as petitioner. (SOF ¶ 48.) Although Plaintiff denies the following, Zima states that he then asked Aydin what she wanted, to which Aydin responded that she wanted her phone returned. (SOF, RSOF ¶ 55.) Zima also alleges, and Plaintiff denies, that Zima then asked Plaintiff if he had the phone, to which Plaintiff responded that he did not have it and that Zima could search his car and his house. (*Id*. ¶ 56.)

Zima walked up to Plaintiff's apartment building and pushed the buzzer for his unit, 1-E. (RSOF ¶ 57.) Plaintiff's brother, Abdul-Aziz, buzzed in Zima, who then proceeded to the unit, knocked on the door, and met Abdul-Aziz, who said "hi." (*Id*. ¶¶ 58, 73.) The parties dispute whether Abdul-Aziz expressly told Zima that he could enter the apartment. Plaintiff states that Zima continued into the apartment without asking for permission or consent to enter. (RSOF ¶ 59, SAF ¶ 10.) Zima, on the other hand, alleges that Abdul-Aziz said he did not think the phone was in the house but that Zima could enter the apartment and help him search for it. (SOF ¶ 59.) According to Abdul-Aziz, before Zima walked into the apartment, he told Abdul-Aziz that he was looking for Aydin's phone. (RSOF ¶ 76.) Abdul-Aziz also testified that Zima did not "deceive" or "trick" him in order to gain access to the apartment. (RSOF ¶ 74.) Abdul-Aziz did not hear his brother yelling to him from outside that Zima did not have permission to enter the apartment. (Aldakhlla Dep. 67:20-24, 68:1-4.) According to Abdul-Aziz, he did not object

---

[3] Zima accurately points out that Plaintiff cites to his own deposition in support of this fact as well as his attorney's deposition. His attorney's testimony about what Aydin stated constitutes hearsay and is therefore inadmissible. Regardless of the admissibility and/or weight of this fact, however, Aydin's alleged statement about the vacated order of protection does not affect our analysis as to any of Plaintiff's claims.

to Zima entering because he was a police officer.  (RSOF ¶ 74; SAF ¶ 11.)  Lastly, Abdul-Aziz testified that he stood next to Zima while Zima searched for the phone, that he did not object while Zima searched, and that he did not feel threatened during the course of the search.  (RSOF ¶¶ 76, 77.)

Although the amount of time that Zima was initially in the apartment is in dispute, the parties agree that Zima at some point left to ask Aydin for her cell phone number so that he could call it from his phone, which Aydin agreed to do.  (*Id*. ¶¶ 61–62.)  When Zima returned to the apartment building, Abdul-Aziz again buzzed Zima in and then also opened the apartment door for him.  (*Id*. ¶ 79.)  Zima dialed Aydin's number and heard a ringtone coming from the bathroom sink.  (*Id*. ¶¶ 63–64.)  After finding her phone, he returned it to her outside.  (*Id*. ¶ 65.)  Plaintiff asserts, and Zima denies, that Plaintiff "informed Zima multiple times prior to entering his apartment, the first and second time, that he did not have permission or consent."  (SAF, RSAF ¶ 7.)

After arriving at the Village of Justice Police Department, Zima spoke to Plaintiff's immigration attorney, Cherissa Loire, over the phone.  (RSAF ¶ 12.)  Loire faxed the order that vacated or terminated the May 23, 2011 order of protection and spoke with someone at the police department after the document was received.  (*Id*. ¶ 14.)  Loire informed whomever she was speaking with that he could call the Cook County Clerk to verify that the order was vacated.  (*Id*. ¶ 17.)  The parties agree that Zima was shown the fax, although they dispute whether that occurred before or after Plaintiff was processed.  (SOF, RSOF ¶ 66.)  They also dispute whether the faxed copy had an official seal.  (*Id*. ¶¶ 66, 67.)

Plaintiff was charged with violating the protective order.  (RSOF ¶ 70.)  When Plaintiff was released from jail five days later, on June 13, 2012, he was required to wear a GPS

monitoring device until June 22, 2012, when his case was called for hearing and the charges

were dismissed against him. (RSAF ¶¶ 23, 24.) At the hearing, Plaintiff's attorney, Peter

Papoutsis, told the court that "it looks like this is a violation of an order of protection" and that

"there has been an ongoing issue with this order of protection inasmuch as my client has been

arrested for violating it several times." (*Id*. ¶ 71.) Papoutsis told the court that the order had

been terminated on June 14, 2011, but "it has never come out of the computer for LEADS so he

keeps getting picked up on this." (*Id*. ¶ 72.) According to Officer Bonkowski, there have been

times when the LEADS system has been incorrect and Village of Justice police officers, upon

seeing the person's "proper paperwork on them, the official stamp from a judge" have either

released the person or investigated it further. (SAF ¶ 20 (citing Bonkowski Dep., SAF, Ex. 6,

41:6-23 (referring to situations involving a suspended license or warrant)).)

Plaintiff filed a complaint on October 12, 2012, and an amended complaint on March 5,

2013, against Zima for (1) unreasonable search and (2) false arrest, and against both Zima and

the Village of Justice for (3) malicious prosecution and (4) trespass. (Compl., Dkt. No. 1;

Amended Compl., Dkt. No. 15.) The Village of Justice, Plaintiff avers, is liable for Zima's acts

under the doctrine of respondeat superior. (Amended Compl., Dkt. No. 15, ¶¶ 35, 39.) On

October 31, 2013, Zima and the Village of Justice filed a motion for summary judgment. (Mot.,

Dkt. No. 22.)[4]

---

[4] Thereafter, the parties filed their respective Local Rule 56.1 statements. (SOF, Dkt. No. 23;
SAF, Dkt. No. 31.) The parties have disputed much of the 56.1 statement of facts as well as the
additional statements of fact. (RSOF, Dkt. No. 30; RSAF, Dkt. No. 42.) Additionally, Zima
filed an objection to certain paragraphs in Plaintiff's response to his rule 56.1(A) statement of
facts. (Obj to Pl.'s Resp, Dkt. No. 36.) We need not rule on these objections because the
underlying disputed facts are immaterial to our decision.

**DISCUSSION**

## I. Summary Judgment Standard of Review

Summary judgment will be granted in favor of the moving party if "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden of establishing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 2552 (1986). When ruling on a motion for summary judgment, we must view evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); *Rebolar ex rel. Rebolar v. City of Chi., Ill.*, 897 F. Supp. 2d 723, 726 (N.D. Ill. 2012). If and only if a reasonably jury could not return a verdict for the nonmovant, is summary judgment warranted. *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

## II. Federal Claims

### A. False Arrest

#### 1. Probable Cause

##### a. Standard of review

To prevail on a claim of false arrest under the Fourth Amendment and Section 1983, Plaintiff must show that he was arrested without probable cause. "Probable cause is an absolute bar to a claim of false arrest asserted under the Fourth Amendment and Section 1983." *Zitka v. Village of Westmont*, 743 F. Supp. 2d 887, 908 (N.D. Ill. 2010) (citing *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 622 (7th Cir. 2010)); *Abbott v. Sangamon County*, 705 F.3d 706, 713–14 (7th Cir. 2013); *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009). Probable cause must be assessed objectively. "[A] court looks at the conclusions that the arresting officer

reasonably might have drawn from the information known to him rather than his subjective reasons for making the arrest." *Holmes v. Hoffman Estates*, 511 F.3d 673, 679 (7th Cir. 2007) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S. Ct. 588, 593–94 (2004); *Whren v. United States*, 517 U.S. 806, 812–13, 116 S. Ct. 1769, 1774 (1996)).  To make that objective assessment, we "must consider the facts as they reasonably appeared to the arresting officer, seeing what he saw, hearing what he heard, and so forth." *Holmes*, 511 F.3d at 679 (citing *Wagner v. Washington County*, 493 F.3d 833, 836 (7th Cir. 2007)); *Williams v. Rodriquez*, 509 F.3d 392, 398–99 (7th Cir. 2007).  While probable cause to arrest depends on the elements of the applicable state criminal law, *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 761 (7th Cir. 2006) (citing *Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001)), it "does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands," *Gerstein v. Pugh*, 420 U.S. 103, 121, 95 S. Ct. 854, 861 (1975); *Mucha v. Village of Oak Brook,* 650 F.3d 1053, 1056–57 (7th Cir. 2011); *U.S. v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003).

Also an important factor is the timing of a probable cause determination, the existence of which turns on the information known to the officer at the moment the arrest is made, not on subsequently received information.  *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 2000).  Once probable cause has been established, an officer has "no constitutional obligation to conduct further investigation in the hopes of uncovering potentially exculpatory evidence." *Id*. (quoting *Eversole v. Steele*, 59 F.3d 710, 718 (7th Cir. 1995)).  Keeping these standards in mind, we next assess whether no reasonable trier of fact could find that Zima did not have probable cause to arrest Plaintiff.

**b. The parties' arguments as to probable cause**

Zima argues that he had probable cause to arrest Plaintiff based on the information he had at the scene, including LEADS, which showed that the May 23, 2011 order of protection against Plaintiff was still active. (Mem. at 7–8.) Plaintiff counters that the "only" information Zima relied upon to arrest Plaintiff was the information in LEADS, which "is known to be incorrect and contain information that has been improperly left in the system." (Resp. at 6–7.) After Zima handcuffed Plaintiff and placed him in the back of the squad car, Plaintiff argues that both he and Aydin informed Zima "multiple times" that the order of protection had been vacated months prior to June 8, 2012 and that they could obtain copies of the order. (*Id*. at 7.) According to Plaintiff, no reasonable officer in Zima's position would believe that there was probable cause to arrest Plaintiff. (*Id*. at 6.)

Furthermore, Plaintiff avers, even if the order of protection was active, Zima still lacked probable cause to arrest him because no reasonable person would believe, based on the facts with which Zima was presented, that the elements required to prove a violation were present. (*Id.* at 7.) To violate an order of protection, both an *actus reus*, "an act prohibited by a valid order of protection," and *mens rea*, "actual knowledge of the contents of the order," are required. *People v. Hinton*, 402 Ill. App. 3d 181, 183–84, 931 N.E. 2d 769, 771 (3rd Dist. 2010) (quoting 720 ILCS 5/12-30(a)(2)); *People v. Davit*, 366 Ill. App. 3d 522, 525, 851 N.E. 2d 924, 927 (2nd Dist. 2006) ("The offense of violating an order of protection is not a strict liability offense, and the State is required to prove both *actus reus*, a guilty act, and *mens rea*, a guilty mind."). Accordingly, given how Plaintiff had committed neither element of the offense, and "[b]ased upon all the facts known to Zima at the time, a reasonable and prudent person would not believe there was probable cause to arrest Plaintiff on June 8, 2012. Alternatively, there is at the very

least a genuine issue of material fact." (Resp. at 8.) According to Plaintiff, he notified Zima that it was Aydin who contacted Plaintiff over the phone and drove voluntarily to his apartment and that Plaintiff was the one who called the police to his apartment. (*Id*. at 7.) It was unreasonable, Plaintiff argues, for Zima to ignore the information that Plaintiff provided on the scene and rely instead on "a computer system, which is anything but infallible, [as] a more appropriate basis for his probable cause determination." (*Id*.)

### c. Analysis

When assessing all of the facts known to Zima, we keep in mind when determining whether a reasonable officer in his position would have probable cause that summary judgment is improper and should not be granted if there "is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." *Sornberger v. City of Knoxville, Ill.*, 434 F.3d 1006, 1013–14 (7th Cir. 2006) (quoting *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993)). It is clear for the reasons discussed below, however, that there is no room for a difference of opinion as to the facts or the reasonable inferences, which demonstrate that Zima had probable cause to arrest Plaintiff based on the information he had on the scene.

### i. Totality of the circumstances

"A person commits the offense of violating an order of protection when he commits an act prohibited by a valid order of protection and has been served notice of the contents of the order 'or otherwise has acquired actual knowledge of the contents of the order.'" *Hinton*, 402 Ill. App. 3d at 183–84 (quoting 720 ILCS 5/12-30(a)(2)); *Davit*, 366 Ill. App. 3d at 525. On the scene, Zima was faced with facts indicating that Plaintiff had both the *actus reus* and *mens rea* necessary to violate the protective order.

First, a reasonable arresting officer would have relied on LEADS, an official government database, in making a probable cause determination, despite Plaintiff's claim that the order had been vacated. Courts, and not the police, should determine whether to credit a suspect's claim of innocence or an eyewitness account. *Hernandez v. Sheahan*, 455 F.3d 772, 775 (7th Cir. 2006). The "Constitution permits [police] to initiate the criminal process and leave the sifting of competing claims and inferences to detectives, prosecutors, judges, and juries in the criminal prosecution." *Askew v. City of Chi.*, 440 F.3d 894, 896 (7th Cir. 2006) ("If states think that this gives accused persons insufficient protection, they are free to enact statutes either staying the officers' hand or providing recompense to those exonerated in the criminal process."). Moreover, Zima was not relying just on the official government database when he determined that there was probable cause to arrest Plaintiff. The surrounding facts with which Zima was presented would lead a reasonable officer in his position to believe that the elements required to prove a violation of an order of protection were present. Not only did LEADS show that there was an outstanding order of protection against Plaintiff, who was present at the scene, but it also showed that it was entered in favor of Aydin, who was present at the scene. Additionally, the order of protection prohibited Plaintiff from taking or concealing or otherwise disposing of Aydin's property. Aydin had called the police department and told the operator that Plaintiff had taken her cell phone, and Zima was present when she yelled at Plaintiff to return her phone.

Plaintiff's argument that he "did not have the requisite intent" to violate the order of protection is not relevant to the issue of whether an officer in Zima's position would have had probable cause to believe that Plaintiff had violated the order. (Resp. at 8.)[5] According to

_____

[5] Additionally, with regard to Plaintiff's argument that "Zima's own testimony would make the most casual observer incredulous over what, in his opinion, constitutes a violation of an order of protection," (Resp. at 8), the reasonableness of an officer's actions does not depend on his subjective motivations. "Rather, the existence of probable cause depends on whether the "'facts

Plaintiff, he told Zima the following information: that Aydin was the one who originally contacted Plaintiff, that Plaintiff was the one who called the police to his apartment, and that the order had been vacated. First, in light of the fact that Plaintiff, the arrestee, was the one conveying this information, we reiterate that courts, not the police, should determine whether to credit a suspect's claim of innocence or an eyewitness account. *Hernandez*, 455 F.3d at 775; *Askew*, 440 F.3d at 896. Second, the information provided by Plaintiff must be considered not in isolation, but in combination with the other facts upon which Zima was relying. As previously discussed, Zima was relying on the information provided in LEADS, the fact that Plaintiff was present with Aydin on the scene contrary to the requirements of the order of protection, and the fact that Aydin had called the police and, in front of Zima, yelled at Plaintiff for taking her phone.

The totality of the circumstances indicate that the elements required to prove a violation of a protective order, as Zima reasonably believed them to be, were present when he made a probable cause determination to arrest Plaintiff. Zima reasonably determined that Plaintiff had committed a voluntary act to violate the order of protection and that he had the requisite mental state in doing so. Therefore, despite Plaintiff's claims of innocence and in spite of the fact that the information in LEADS ultimately turned out to be outdated, a reasonable trier of fact would find that at the time of Plaintiff's arrest, Zima had probable cause. [6]

---

and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" *Tevins v. Mushol*, 692 F.3d 807, 816 (7th Cir. 2012) (citing *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 2632 (1979))).

[6] "In reviewing probable-cause determinations, it is common and helpful for courts to consider possible innocent alternatives that might explain the facts before the agents[, but] . . . the mere existence of innocent explanations does not necessarily negate probable cause[.]" *Funches*, 327 F.3d at 587 (finding probable cause in part because "no innocent explanations are reasonably

Although the cases cited by Zima, (*see* Mem. at 7), are distinguishable from the facts of this case in that they concern instances of misidentification,[7] the Seventh Circuit's reasoning in those cases also applies here. According to the Seventh Circuit, "'the peril of liability under Section 1983' should not be placed upon arresting officers every time they are faced with a practical dilemma of arresting or releasing an individual who, despite some discrepancies in description, they reasonably believed to be the intended subject on the arrest warrant." *White v. Olig,* 56 F.3d 817, 820 (7th Cir. 1995) (quoting *Johnson v. Miller*, 680 F.2d 39, 41 (7th Cir. 1982); *Patton v. Przybylski*, 822 F.2d 697, 699 (7th Cir. 1987)); *see also Catlin v. City of Wheaton*, 574 F.3d 361, 366 (7th Cir. 2009) (arresting officers "are required to show only the reasonableness of their belief that the person they arrested was the person they were seeking; they are not required to show that they know with certainty that the person they arrested was the person they were seeking").

Here, Zima was not required to know with certainty that information in the LEADS database was accurate. His belief need only have been reasonable. We find that it was reasonable for Zima to rely on official records despite the protestations of Plaintiff, the arrestee. Again, probable cause does not require the existence of criminal activity to be more likely true than not. *Gerstein*, 420 U.S. at 121, 95 S. Ct. at 861; *Mucha,* 650 F.3d at 1056–57; *Funches*, 327 F.3d at 587. The "peril of liability" under the Fourth Amendment and Section 1983 "should not be placed upon arresting officers every time they are faced with a practical dilemma of arresting or releasing an individual who, despite some discrepancies" as suggested by that individual, is listed in an official database as being subject to an order of protection. *See White*, 56 F.3d at

<hr>

apparent as to why [the defendants] would have conducted their transaction in the way they did").

[7] Here, Plaintiff produced his identification, which matched the LEADS' information. There was no doubt that Plaintiff was the individual named in the order of protection.

820; *see also*, in the qualified immunity context, *Beier v. City of Lewiston*, 354 F.3d 1058, 1070–71 (9th Cir. 2004) (when there is a conflict between legal information obtainable from official channels and legal information from lay citizens, police officers may reasonably rely upon officially-obtained information"); *Lauer v. Dahlberg*, 717 F. Supp. 612, 614 (N.D. Ill. 1989) (concluding that an officer was entitled to rely on information received from LEADS despite having been presented with an uncertified copy of a warrant recall order), *aff'd*, 907 F.2d 152 (7th Cir. 1990)).[8]

Zima was entitled to rely on the information he was provided with in the official government database given the surrounding facts. In light of all of the information with which Zima was presented, we find that no reasonable trier of fact could find that Zima did not have probable cause to arrest Plaintiff.

### ii. Duty to Investigate

Plaintiff's argument that we should deny Zima's motion because he had a duty to investigate is misplaced. Plaintiff cites *Zitka* for the proposition that, "[g]enerally, an officer has no duty to investigate once probable cause is established. However, 'if a victim or witness's information would lead a reasonable officer to be suspicious, the officer has a duty to pursue reasonable avenues of investigation and may not close his eyes to facts that would clarify the situation.'" (Resp. at 9 (quoting *Zitka,* 743 F. Supp. 2d at 908 (internal citations omitted)).) To

---

[8] With regard to Plaintiff's argument that the information in LEADS is "known to be incorrect," (Resp. at 6), no evidence indicates that an officer in Zima's position should have been on notice that LEADS had previously contained incorrect information improperly left in the system. Although one or more Village of Justice officers may have investigated discrepancies between records in the past (over a suspended license for instance, *see* Bonkowski Dep. 41:6-23), the evidence does not show the extent to which officers were or should have been aware of these discrepancies. Regardless, and although these facts present a highly unfortunate circumstance, it is reasonable for an officer to rely on an official database until a judge has the opportunity to sort out a potential discrepancy.

fully understand an officer's duty to investigate based on this language, however, we must address its surrounding context.

The first contextual point in *Zitka*, which Plaintiff fails to mention, is that "[a]n officer may base a determination of probable cause on information from a single putative victim or eyewitness if the officer reasonably believes that the victim is telling the truth." *Zitka*, 743 F. Supp. 2d at 908 (citing *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009); *Woods v. City of Chi.*, 234 F.3d 979, 996 (7th Cir. 2000)). Here, the information Zima received was not offered from just any witness, but rather the arrestee. This fact leads us to the second contextual point, which concerns credibility. "In crediting the complaint of a reasonably believable witness or putative victim," the court in *Zitka* continued, "the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth." *Zitka*, 743 F. Supp. 2d at 908 (citing *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003)). As *Zitka* makes clear, Zima was "under no constitutional obligation to exclude all suggestions that [Plaintiff was] not telling the truth." *Id.* It would be reasonable—given the surrounding circumstances—for an officer in Zima's position to doubt the information provided by Plaintiff, given that he was subject to the order of protection listed in LEADS. Even accepting Plaintiff's allegation that Aydin also informed Zima that the order had been vacated, we find it reasonable for an officer in Zima's position to question the trustworthiness of her statements as well, especially in light of the fact that Plaintiff was present on the scene.

Next, we address the third point in *Zitka* that arises with respect to an officer's duty to investigate: "Whether or not an officer must conduct some investigation before making an arrest depends on factors including the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the

alleged crime." *Zitka*, 743 F. Supp. 2d at 908 (citing *Stokes*, 599 F.3d at 625). Here, the information provided to Zima on the scene indicated, as we have discussed, that there was probable cause to arrest Plaintiff for violating an order of protection. The gravity of the potential crime was serious in that a violation of a protection order carried with it the risk of physical harm to the victim. Moreover, based on the information in LEADS, the crime appeared to be ongoing, given that Plaintiff and Aydin were both present and Aydin was alleging that Plaintiff had stolen her phone. Given the totality of all of these factors, Zima was under no obligation to conduct further investigation before arresting Plaintiff.

Notably, the court in *Zitka* found that an officer in that case had probable cause to make a battery arrest. *Zitka*, 743 F. Supp. 2d at 911–12. "Although the officer 'may not ignore conclusively established evidence of the existence of an affirmative defense, the Fourth Amendment imposes no duty to investigate whether a defense is valid.'" *Id*. at 911. The evidence in *Zitka*, which indicated that the plaintiff was attempting to stop a trespass to his home when the alleged battery occurred, did not "conclusively establish[]" that Plaintiff had an affirmative defense to battery. *Id*. (quoting *McBride*, 576 F.3d at 707). In the case before us, it is "far from 'conclusively established'" that the order of protection against Plaintiff had been vacated at the time of his arrest. *See id*. After learning from dispatch that there was an active order of protection naming Plaintiff as a respondent and Aydin as the petitioner, Zima checked his computer and reviewed the information provided by LEADS, which confirmed the information provided by dispatch. Although Plaintiff voiced an objection to the accuracy of this record and allegedly offered to show Zima a copy of the order vacating the order of protection, doing so would not have "conclusively established" that the LEADS information was incorrect and that the order had been vacated, especially in light of the fact that the order of protection

prohibited Plaintiff from having any contact with Aydin and from taking or concealing her

property. As the Seventh Circuit stated,

> First, criminal suspects frequently protest their innocence, and a suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events. Second, once an officer learns sufficient trustworthy information establishing probable cause, he is entitled to rely on what he knows in pursuing charges or an arrest, and is under no further duty to investigate.

*Beauchamp*, 320 F.3d at 744 (internal citations omitted). Plaintiff's claims of innocence in this

case did not trigger a duty to investigate, especially in light of the information provided by

LEADS, an official government database, and the surrounding circumstances of Plaintiff's

arrest.[9] Zima, as the arresting officer, was entitled to "act on the basis of inculpatory evidence

without trying to tote up and potentially weigh all exculpatory evidence." *See Hernandez*, 455

F.3d at 775; *Askew*, 440 F.3d at 896. For all the reasons discussed, Plaintiff's argument that

Zima had a duty to investigate further fails.

In sum, at the time of Plaintiff's arrest, a reasonable person in the position of an arresting

officer had probable cause to arrest Plaintiff for violating an order of protection. "Police officers

possess probable cause to arrest '"when the facts and circumstances within their knowledge and

of which they have reasonably trustworthy information are sufficient to warrant a prudent person

in believing that the suspect had committed" an offense.'" *Williams*, 509 F.3d at 398–99

(quoting *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006) (quoting *Kelley v. Myler*, 149

---

[9] The Seventh Circuit adds that although "a potentially solid claim of alibi might warrant more credit than a bald assertion of innocence," plaintiff's claim in that case "would not have conclusively established his whereabouts." *Beauchamp*, 320 F.3d at 744. Here, even accepting that Aydin made a statement concerning the vacated order and even assuming that Plaintiff or Aydin gave Zima a copy of the order vacating the order of protection, these facts, although they "might warrant more credit than [Plaintiff's] bald assertion of innocence," still would not have "conclusively established" that the LEADS information was incorrect and that there was no outstanding order of protection.

F.3d 641, 646 (7th Cir. 1998))).  When we view the totality of the circumstances surrounding

Plaintiff's arrest, we think that the finding of probable cause by a trained and experienced officer

was reasonable.  Moreover, Zima was under no obligation to conduct further investigation based

on Plaintiff's claims of innocence.  *Spiegel*, 196 F.3d at 723; *Askew*, 440 F.3d at 896.  Based on

the information available to him at the time of the arrest, including the information contained in

LEADS, which showed that the order of protection against Plaintiff was still in effect on June 8,

2012, there was probable cause to arrest Plaintiff.  We therefore grant summary judgment in

favor of Zima as to Plaintiff's false arrest claim.

### B. Unreasonable Search of Plaintiff's residence

A warrantless search is unreasonable under the Fourth Amendment unless: (1) exigent

circumstances and probable cause exist; or (2) consent is given.  *Reardon v. Wroan*, 811 F.2d

1025, 1027–28 (7th Cir. 1987).  "The probable cause and warrant requirements of the Fourth

Amendment are not applicable where a party consents to a search, *Schneckloth v. Bustamonte*,

412 U.S. 218, 93 S. Ct. 2041 (1973), where a third party with common control over the searched

premises consents, *Florida v. Jimeno*, 500 U.S. 248, 111 S. Ct. 1801 (1991), or where an

individual with apparent authority to consent does so, *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.

Ct. 2793 (1990)."  *United States v. Melgar*, 227 F.3d 1038, 1041 (7th Cir. 2000).

Although the defendant must initially produce evidence of consent to show that the

search was reasonable, if he does so, then the burden shifts to the plaintiff to prove that his

consent was the product of duress or coercion and that the search was unreasonable.  *Valance v.

Wicel*, 110 F.3d 1269, 1279 (7th Cir. 1997).  Because "the existence and voluntariness of a

consent is a question of fact[,] . . . only where the district court's finding of a voluntary consent

is clearly erroneous may a reviewing court set it aside." *United States v. Griffin*, 530 F.2d 739, 742 (7th Cir. 1976) (internal citations omitted).

In dispute is whether Plaintiff gave Zima consent to enter his apartment. According to Zima, Plaintiff twice stated, both before and after his arrest, that he did not have Aydin's phone and that Zima could search his house and his car. Plaintiff counters that he informed Zima "multiple times" that he had no permission to enter his apartment. The parties also dispute whether his brother, Abdul-Aziz, expressly gave Zima permission to enter.[10] Not in dispute, however, is the fact that Plaintiff's brother buzzed Zima through the front security gate and also opened the door to their apartment, not once but twice, and stood by Zima as he searched the apartment. Although we cannot assess at the summary judgment stage whether Plaintiff's brother gave express consent, we are able to determine, based on the facts, whether a reasonable trier of fact could find that he did not give implied consent. We also address whether Plaintiff's brother had the authority to give consent in spite of Plaintiff's alleged express indication to Zima that he did not have consent.

### 1. Plaintiff's brother gave Zima implied, voluntary consent

Consent may be given either verbally or nonverbally. *Griffin*, 530 F.2d at 742. While consent may take "the form of words, gesture, or conduct," it "must be voluntary, i.e. freely and intelligently given." *Id.* (citing *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788, 1792 (1968)). Whether consent to search is "voluntary," or the product of duress or coercion, is a question of fact to be determined from the totality of all the circumstances.

---

[10] SOF ¶ 59 (citing Zima Dep. 34:16–22 (Zima stated, "I told [Abdul-Aziz] that his brother's being accused of stealing Lisa's phone and if it was inside and asked him if he could take a look around for it. He then said, 'I don't think [the phone is] in here." He said, 'You can come in and help me search for it.'")); RSOF ¶ 59 (denying that this actually occurred and citing Aldakhlla Dep. 64:10–24; 65:11–23 (Abdul-Aziz stated that he opened his door and said "Hi" . . . "Actually here's confusing point. He didn't ask for permission, at the same time I couldn't say no for him stop don't come in . . . He's police officer I can't say no for him.")).

> While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent. . . In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents. . . [I]t is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced. It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches.

*Bustamonte,* 412 U.S. at 227, 93 S. Ct. at 2048. Thus, while consents to search must be voluntary (free of coercion), they need not necessarily be knowing (with awareness of the constitutional right being surrendered). *See also* Wayne R. LaFave, 4 Search & Seizure § 8.2, *Search and Seizure: A Treatise on the Fourth Amendment* (5th ed. 2012).

The voluntariness of the consent is a factual assessment that depends upon the totality of the circumstances. *Ohio v. Robinette,* 519 U.S. 33, 34, 117 S. Ct. 417, 419 (1996); *Griffin*, 530 F.2d at 742; *Bustamonte*, 412 U.S. at 227. Relevant factors include: (1) the person's age, intelligence, education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave the consent. *United States v. Raibley*, 243 F.3d 1069, 1075–76 (7th Cir. 2001) (citing *United States v. Strache*, 202 F.3d 980, 985 (7th Cir. 2000); *Valance v. Wisel*, 110 F.3d 1269, 1278 (7th Cir. 1997)). "Neither the presence nor the absence of any single criteria can be controlling in the determination." *Griffin*, 530 F.2d at 742 (citing *Bustamonte,* 412 U.S. at 226; 93 S. Ct. at 2047).

Nowhere do the parties address whether Abdul-Aziz had actual or apparent authority to give consent. Rather, their argument rests on whether Abdul-Aziz gave consent. For the record, however, we take into account the facts showing that on June 8, 2012, Abdul-Aziz was living as

a "permanent resident" with Plaintiff at 8142 Thomas Street, Apartment 1-E, that he was over 18-years-old, and that he spoke English. (RSOF ¶ 81; Pl.'s Dep. 105:8–19; Aldakhlla Dep. 68:18, 20:6-15.) The exception for consent extends to entries and searches with the permission of a co-occupant whom the police reasonably, but erroneously, believe to possess shared authority as an occupant. *Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800. It would have appeared to an officer in Zima's position that Abdul-Aziz, Plaintiff's brother, had common control over the apartment and thus, at a minimum, had apparent authority to give consent. *See Melgar*, 227 F.3d at 1041 (citing *Florida v. Jimeno*, 500 U.S. 248, 111 S. Ct. 1801, *Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793).

Although the parties dispute whether Zima expressly asked for permission to enter the apartment, Abdul-Aziz testified that he did not object to Zima's entry. (RSOF ¶¶ 70–71, 77; Aldakhlla Dep., Reply, Ex. B 67:17–19.) While the absence of objection is relevant to whether consent was freely and voluntarily given, something besides silence or lack of objection must be present. *Padilla v. City of Chi.*, 932 F. Supp. 2d 907, 925 (N.D. Ill. 2013) ("Instead something more—even if it is nonverbal—must be present to show the occupant has consented."); *Hadley v. Williams*, 368 F.3d 747, 750 (7th Cir. 2004) ("The fact that a person answers a knock at the door doesn't mean that he agrees to let the person who knocked enter."). For instance, the court in *Padilla* cites *United States v. Villegas*, 388 F.3d 317, 324–25 (7th Cir. 2004), *United States v. Cotnam*, 88 F.3d 487, 495 (7th Cir. 1996), and *Griffin*, 530 F.2d at 743, stating "[i]n each of those cases an occupant said or did something to indicate to the police that they could enter, if nothing more than opening the door in response to the police's announcement of office and orally agreeing to speak with the police." *Padilla*, 932 F. Supp. 2d at 925. As in those cases, here there are more facts than just Abdul-Aziz's alleged silence that indicate he consented to

Zima's entry. He buzzed Zima into the building twice, and also opened the door to the apartment unit twice, said "Hi" upon the first instance, and allowed him to enter both times. Furthermore, he stood by Zima's side without objection as he searched.

Given Zima's status as a police officer, we take into account that "[s]ubtle coercion, in the form of an assertion of authority or color of office by the law enforcement officers may make what appears to be a voluntary act an involuntary one." *Griffin*, 530 F.2d at 742. In this case, however, the facts do not indicate that subtle coercion was present. Abdul-Aziz admitted that he did not feel that Zima forced him to consent to the search; that he did not feel threatened or afraid during the search; and that as Zima searched, he stood next to him. He also testified Zima did not threaten to arrest him or Plaintiff if he did not allow him to search the apartment. Furthermore, he acknowledged that Zima did not use deception or trickery to gain entry to the house. According to Abdul-Aziz, Zima told him that he was looking for Aydin's phone.

As discussed, although a police officer's failure to inform someone that he can refuse consent to search is a factor to consider in determining if the consent to search was voluntary, the absence of such information does not automatically render the accused's consent involuntary. *Bustamonte*, 412 U.S. at 227, 93 S. Ct. at 2048 (consent need only be voluntary, not knowing). Therefore, it is not determinative that Abdul-Aziz did not believe he could object because Zima was a police officer. The facts clearly show that, based on the totality of the circumstances, Zima had implied, voluntary consent from Abdul-Aziz to enter the apartment to search for Aydin's phone.

## 2. Plaintiff did not override his brother's consent

Despite our finding that Abdul-Aziz gave implied consent, we must also take into account Plaintiff's allegation that Plaintiff himself informed Zima "multiple times" that he did

not have permission or consent to enter his apartment.[11]  Although the Fourth Amendment

recognizes a valid warrantless entry and search of premises when police obtain the voluntary

consent of an occupant who shares, or is reasonably believed to share, authority over the area in

common with a co-occupant, it is not valid when a physically present co-occupant refuses to

consent.  *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S. Ct. 1515, 1518–19 (2006).  In

*Georgia*, the Supreme Court held that consent given by one occupant is not valid in the face of

the refusal of another "physically present" occupant.  *Id*. 547 U.S. at 121–22, 126 S. Ct. at 1527–

28.  In that case, the "physically present" defendant was at the door and objecting.  *Georgia*, 547

U.S. at 107, 126 S. Ct. at 1519.  We now address whether Plaintiff, who was sitting in the squad

car when he allegedly refused to give Zima consent to search his apartment, was "physically

present" for purposes of the Fourth Amendment analysis.

 Two Supreme Court cases shed light on the instant facts.  In *Rodriguez* and *Matlock*, the

defendants, although not immediately present with the opportunity to object, were not far away.

*Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793 (1990); *United States v. Matlock*, 415 U.S.

164, 94 S. Ct. 988 (1974).  In *Matlock*, the defendant was in a squad car not far away when his

co-occupant at the door of their residence had consented to the search.  *Matlock*, 415 U.S. at

167–171, 94 S. Ct. at 991–93.  In *Rodriguez*, the defendant was "asleep in the apartment" when

the police entered with only the consent of an apparent co-tenant.  *Rodriguez*, 497 U.S. at 179,

110 S. Ct. at 2796–97.  When comparing these cases to the facts before it in *Georgia*, the

Supreme Court acknowledged the following:

> we have to admit that we are drawing a fine line; if a potential defendant with self-
> interest in objecting is in fact at the door and objects, the co-tenant's permission does not
> suffice for a reasonable search, whereas the potential objector, nearby but not invited to
> take part in the threshold colloquy, loses out.

---

[11] We emphasize here that Abdul-Aziz testified that he never heard his brother yelling to him that
Zima did not have permission to enter the apartment.  (Aldakhlla Dep. 67:20-24, 68:1-4.)

*Georgia*, 547 U.S. at 121, 126 S. Ct. at 1527.

Although we agree that the line drawn by the Supreme Court is a fine one, the facts here clearly align with *Matlock* and *Rodriquez* rather than *Georgia*. Like the defendant in *Matlock*, Plaintiff was in the squad car when his brother, his co-occupant, consented to Zima searching their apartment. And, needless to say, given that he was sitting in the squad car outside the apartment building, Plaintiff was further away than the defendant in *Rodriguez*. Therefore, for purposes of the "threshold colloquy," Plaintiff was not "physically present" and thus unable to override his brother's consent. The facts of this case differ from *Matlock* and *Rodriguez* in that the defendants in those cases did not expressly indicated to the police that they did not have consent to search the residence. Here, Plaintiff alleges that he expressly stated to Zima on two occasions that he did not have his consent to search the apartment. Even if true, however, this fact does not alter the analysis. The Supreme Court's rationale still applies: "customary social understanding accords the consenting tenant authority to prevail over the co-tenant's objection" where the co-tenant is not physically present, but not where the co-tenant is at the door objecting. *Georgia*, 547 U.S. at 104–05, 126 S. Ct. at 1518.

> So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance specifically to avoid a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when no fellow occupant is on hand, the other according dispositive weight to the fellow occupant's *expressed* contrary indication.

*Id.* (emphasis added). In other words, even if a defendant expressly indicates to an officer that he does not have consent to search, his co-occupant still retains the authority to consent so long as the defendant is not standing at the door and so long as the police have not removed him. Here,

Zima did not forcibly remove Plaintiff from the entrance. In fact, he had arrested and placed Plaintiff in the squad car before he made the decision to search his apartment for Aydin's phone.

We therefore find that Zima had consent to search Plaintiff's apartment in this case. Despite Plaintiff's allegation that he expressly told Zima that he did not have permission or consent to search his apartment, Zima was entitled to rely on the consent given by Plaintiff's brother and cotenant, Abdul-Aziz, who had actual and apparent authority. *See Melgar*, 227 F.3d at 1041. Because Zima had consent to search Plaintiff's apartment, we dismiss Plaintiff's unreasonable search claim.

## III. State Law Claims

Having granted Zima's motion for summary judgment on the false arrest and Fourth Amendment claims, we must assess whether to retain pendent jurisdiction over the remaining state law claims. A district court may retain supplemental jurisdiction over state law claims even after it has dismissed all claims over which it has original jurisdiction. 28 U.S.C. § 1367(c)(3). The Supreme Court has recognized that "pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 1139 (1966); *see also Kennedy v. Schoenberg, Fisher & Newman, Ltd.*, 140 F.3d 716, 727–28 (7th Cir. 1998); *Kevin's Towing, Inc. v. Thomas*, 217 F. Supp. 2d 903, 910 (N.D. Ill. 2002). The Seventh Circuit has repeatedly characterized the district court's discretion to relinquish pendent jurisdiction as "almost unreviewable," especially when all federal claims have been dropped from the case before trial and only state law claims remain. *Kennedy*, 140 F.3d at 728 (citing *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989)); *see Pleva v. Norquist*, 195 F.3d 905, 918 (7th Cir. 1999); *Kevin's Towing, Inc.*, 217 F. Supp. 2d at 910.

The Seventh Circuit has articulated three exceptions to the general presumption that "the pendent claims should be left to the state courts."[12] *Wright*, 29 F.3d at 1251–52; *see Williams*, 509 F.3d at 404. The presumption may be overcome, and pendent jurisdiction appropriately retained, if "any of the following three circumstances exist: (1) the state law claims may not be re-filed because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided." *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008); *Williams*, 509 F.3d at 404. In this case, the third exception applies. Because it is clearly apparent how the state claims are to be decided in this case, remand would not further the interests of judicial economy. *See, e.g., Childress v. City of E. St. Louis, Ill.*, 10-CV-254, 2010 WL 5289261, at *3 (S.D. Ill. Dec. 20, 2010). Accordingly, we next review Plaintiff's supplemental state law claims of trespass and malicious prosecution against Zima and the Village of Justice.

### A. Trespass

Plaintiff alleges that Zima committed the tort of trespass when he entered Plaintiff's residence without permission or authority. (Compl. ¶ 38.) To establish a trespass, Plaintiff must prove "wrongful interference with his actual possessory right in the property." *Great Atlantic & Pacific Tea Co. v. La Salle Nat'l Bank*, 77 Ill. App. 3d 478, 481, 395 N.E. 2d 1193, 1196 (1st Dist. 1979). No liability for trespass attaches, however, when a person's actions are based on consent, be it express or implied, or privilege. *Desnick v. American Broad. Cos.*, 44 F.3d 1345, 1351 (7th Cir. 1995).

---

[12] "[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008); *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007). Under such circumstances, the balancing of "judicial economy, convenience, fairness and comity . . . will point to declining to exercise jurisdiction over any remaining pendent state-law claims." *Wright v. Assoc. Ins. Cos. Inc*., 29 F.3d 1244, 1252 (7th Cir. 1994).

We have already found, for purposes of the Fourth Amendment, that Abdul-Aziz gave Zima consent to enter the apartment. "[T]he law of trespass, however, confers protections from intrusion by others far broader than those required by Fourth Amendment interests." *Oliver v. United States*, 466 U.S. 170, 183 n.15, 104 S. Ct. 1735, 1744 n.15 (1984) ("[T]respass law extends to instances where the exercise of the right to exclude vindicates no legitimate privacy interest."). As the Supreme Court recognized in *Georgia*, "Fourth Amendment rights are not limited by the law of property . . . the third party's 'common authority' is not synonymous with a technical property interest." *Georgia*, 547 U.S. at 110, 126 S. Ct. at 1521. Although a trespass claim is not synonymous with a Fourth Amendment violation, consent can be a defense to both.

Consent in the Fourth Amendment context also does not necessarily operate in the same manner as it does in the context of a trespass claim. *See, e.g., Food Lion, Inc. v. Capital Cities/ABC, Inc.,* 951 F. Supp. 1217, 1223 n.6 (M.D.N.C. 1996) (obtaining consent through false pretenses could sustain a trespass claim, but not necessarily a Fourth Amendment claim with regard to the use of undercover operations, for instance). Here, however, no evidence has been presented suggesting that Abdul-Aziz's consent in this case would be invalid for purposes of the common law tort of trespass. No evidence has been presented, for instance, suggesting that Zima was operating under false pretenses. Abdul-Aziz testified that Zima did not use deception or trickery to gain access to the apartment; Zima in fact informed him that he was there to look for Aydin's phone.

As we did in the Fourth Amendment context, we now address in the trespass context whether Plaintiff's allegation that he expressly informed Zima that he did not have consent to search his apartment overrides his brother's otherwise valid consent. Unlike the Fourth Amendment, the Supreme Court has stated with respect to property law that a "consenting tenant

has the right to admit the police when a physically present fellow tenant objects" because a "property right may [not] be divested by the mere objection of another." *Georgia*, 547 U.S. at 121, 126 S. Ct. at 1527 (stating in reference to *Matlock*, "If [a defendant's] co-tenant is giving permission 'in his own right,' how can his 'own right' be eliminated by another tenant's objection?"). The constitutional sufficiency of a co-tenant's consent to enter and search "rests . . . on mutual use of the property by persons generally having join access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right[.]" *Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7. Under property law, one assumes the risk that by living with others individuals, those individuals will invite others onto the property. Thus, Abdul-Aziz had the right to admit Zima despite the fact that Plaintiff allegedly objected because Plaintiff, under property law, does not have the right to divest his brother of his property right by mere objection.[13]

Having received consent to search the apartment from Abdul-Aziz, Zima had privilege to enter and is thus not liable for trespass. We therefore dismiss Plaintiff's common law trespass claim.

### B. Malicious Prosecution

A plaintiff must prove the following elements to succeed on a malicious prosecution claim under Illinois law: (1) a defendant commenced or continued an original criminal or civil judicial proceeding, (2) the proceeding terminated in favor of the plaintiff, (3) there was the absence of probable cause for such a proceeding, (4) malice was present, and (5) damages resulted to plaintiff. *Padilla*, 932 F. Supp. 2d 907; *Curtis v. Bembenek*, 48 F.3d 281, 286 (7th Cir. 1995). If any of the elements for a malicious prosecution claim under Illinois law are not

---

[13] Because we find that there was consent to enter Plaintiff's residence, we need not address the parties' arguments as to whether Zima was exercising legal privilege or public duty when he entered for the purpose of retrieving Aydin's cell phone.

satisfied, the plaintiff cannot recover. *Swick v. Liautaud*, 169 Ill.2d 504, 512, 662 N.E.2d 1238, 1242 (1996). The existence of probable cause to arrest, for instance, is a complete defense. *Kies v. Aurora*, 126 F. Supp. 2d 970, 981 (N.D. Ill. 2001).

"An officer has probable cause when there are 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed' a crime." *Holland v. City of Chi.*, 643 F.3d 248, 254 (7th Cir. 2011) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S. Ct. 2627, 2632 (1979)). For purposes of a malicious prosecution claim, the correct time to review probable cause is at the time the charging document is filed, not the time of arrest. *Holland*, 643 F.3d at 254 (internal citations omitted).

Zima states that after arriving at the police department, he spoke with Plaintiff's attorney, Loire, over the phone and that he was also shown a faxed order that purportedly vacated the protective order. The parties dispute, however, whether or not the vacating order was certified. Plaintiff argues that based on this faxed order, in addition to statements made by Plaintiff, Aydin, as well as his attorney, "Zima did not have probable cause to file the charge of a violation of an order of protection. Alternatively, at the very least, there is a genuine dispute of fact." (Resp. at 14.) We disagree. At the time he pursued the charges, Zima did indeed have probable cause to initiate criminal proceedings against Plaintiff. The information in LEADS indisputably showed an active order of protection prohibiting Plaintiff from having any contact with Aydin and from taking or concealing her property. Zima was witness to the fact that, in spite of this order, Plaintiff had contact with Aydin and Aydin had accused him of taking her phone. Zima had also found Aydin's phone in Plaintiff's apartment. The statements provided by Plaintiff, the suspect, and his attorney do not outweigh these facts supporting Zima's probable cause determination.

*See Beauchamp,* 320 F.3d at 744 ("[A] suspect's denial of guilt generally is not enough to trigger a duty to investigate in the face of a reasonably believable witness and readily observable events.").

With regard to Plaintiff's argument as to the faxed order, which was also provided by Plaintiff's attorney, a faxed document is not an official court order. Zima accurately points out that a fax "could have been fabricated, changed or created using a scanner and computer." (SOF ¶ 69.) Given the threat of forged documents, Zima's decision to rely on LEADS until a judge could review the information is certainly a reasonable one.[14] Zima was entitled to rely on the official database until the discrepancy with the information contained in the fax was sorted out by a judge.

Plaintiff also argues that "Zima could have called the Cook County Clerk for verification as to the status of the order of protection[.]" (Resp. at 16.) To the extent that Plaintiff is arguing that Zima had a duty to conduct further investigation, we disagree. Police "need not conduct additional investigation once they have established probable cause." *Holland*, 643 F.3d at 255 (citing *Mustafa*, 442 F.3d at 548). We reemphasize the Seventh Circuit's finding that "once an officer has trustworthy information establishing probable cause, he is entitled to rely on what he knows in *pursuing charges* or an arrest, and is under *no further duty to investigate*." *Beauchamp,* 320 F.3d at 744 (emphasis added). Furthermore, as the First Circuit poignantly states with respect to the duty to investigate and establishing probable cause at the time the charges are filed,

---

[14] According to Plaintiff's attorney, someone at the Justice Police Department informed her over the phone that despite receiving the faxed order, they could not release Plaintiff, even if they were to verify the order with the Cook County Clerk because "their procedures would only allow them to go by the LEADS system . . . Dakhlallah would have to be held until the morning until he saw a judge and that the judge would release him there, once she saw the terminated order of protection." (Loire Dep., Pl.'s SAF, Ex. 3, 57:1–9.)

> The logic underlying these pre-arrest cases applies even more forcefully to discrepancies that come to light only after an arrest has been accomplished. . . [T]he initial determination of probable cause should not be undone by a police officer's assessment of post-arrest evidence that bears adversely on that initial finding. Were the law otherwise, there is a considerable risk that a police officer, subjectively convinced that he has the wrong person, might turn loose a wanted criminal.

*Brady v. Dill*, 187 F.3d 104, 113 (1st Cir. 1999) (internal citation omitted). In *Brady*, the First Circuit addressed the risk of burdening our law enforcement officers, as Plaintiff proposes, with the duty of pursuing post-arrest investigations based on an arrestee's proclamations of innocence. For the same reasons discussed in *Brady*, we decline to adopt Plaintiff's position, which "has the potential of turning police stations into tribunals for making preliminary determinations of guilt or innocence—an eventuality that *Baker* explicitly disavows." *Id*. at 114 (citing *Baker v. McCollan*, 443 U.S. 137, 145–46, 99 S. Ct. 2689, 2695 (1979) (refusing to recognize a constitutional duty on the police's part to investigate a detainee's innocence)).[15]

For these reasons, we agree with Zima that "[a]ny conflict between LEADS data and a faxed copy of a court order should be sorted out in the courtroom, not on the street or in the station house." (Mem. at 12.) He therefore had probable cause at the time he filed the charging document.

The presence of probable cause proves fatal to Plaintiff's malicious prosecution claim for another reason: he has failed to present evidence of malice. *See Holland*, 643 F.3d at 255;

---

[15] The First Circuit further elaborates:

> And, once police feel pressured to make such decisions, they may encroach upon the judiciary's functions, denigrating the authority of warrants issued under the auspices of judicial officers. Should that come to pass, the concerns about unbridled police action that the *Gerstein* Court underscored, 420 U.S. at 117–18, 95 S. Ct. 854, may be realized. Such a happenstance would pose a much greater danger to an ordered conception of liberty than the occasional snafu that the separation of functions regime thus far has produced.

*Brady*, 187 F.3d at 114.

*Turner v. City of Chi.*, 91 Ill. App. 3d 931, 935, 415 N.E.2d 481, 485 (1st Dist. 1980). For purposes of a malicious prosecution claim brought under Illinois law, "malice is defined as the initiation of a prosecution for any reason other than to bring a party to justice." *Holland*, 643 F.3d at 255 (citing *Rodgers v. Peoples Gas, Light & Coke Co.*, 315 Ill. App. 3d 340, 349, 733 N.E.2d 835, 842 (1st Dist. 2000)). Malice may be inferred when a defendant lacks probable cause and the circumstances are inconsistent with the prosecutor's good faith. *Holland*, 643 F.3d at 255; *Denton v. Allstate Ins. Co.*, 152 Ill. App. 3d 578, 587, 504 N.E.2d 756, 762 (1st Dist. 1986). Although lack of probable cause does not alone establish malice, a trier of fact may infer malice from a lack of probable cause "if there is no other credible evidence which refutes that inference." *Rodgers*, 315 Ill. App. 3d at 349, 733 N.E.2d at 842.

Plaintiff argues that because the court in *Jimenez v. City of Chicago* "held that a reasonable jury could infer and therefore find the the [sic] defendants acted with malice because of the lack of investigation based on witness testimony" we should similarly find that Zima acted with malice in this case. (Resp. at 15.) The facts in *Jimenez*, however, are highly distinguishable from this case. In *Jimenez*, a witness told the police, against his own interests, that the plaintiff did not shoot the victim; the police received a tape-recording wherein another individual admitted to committing the murder; and defendant officers pressured two witnesses to change their stories and implicate plaintiff. *Jimenez v. City of Chi.*, 830 F. Supp. 2d 432, 451 (N.D. Ill. 2001) (holding that a reasonable trier of fact could find that the defendants acted with malice). Unlike *Jimenez*, in this case there is indeed other credible evidence that refutes an inference of malice. Not only did LEADS show an active order of protection prohibiting Plaintiff from having any contact with Aydin, it also prohibited him from removing or concealing her property. Zima was witness to the fact that Plaintiff and Aydin were both together as well as Aydin's

allegation that Plaintiff stole her phone. Based on these facts, no reasonable trier of fact could find that Zima acted with malice when he charged Plaintiff with a violation of a protection order.

A plaintiff may also demonstrate malice by showing improper motive, such as a prosecutor proceeding with the prosecution for purposes of injuring a plaintiff. *Turner v. City of Chi.*, 91 Ill. App. 3d 931, 937, 415 N.E.2d 481, 487 (1st Dist. 1980). No such improper motive has been made evident in this case, and the circumstances are not inconsistent with a prosecutor's good faith. Zima did not have improper motive when he based his decision to charge Plaintiff with violating an active order of protection listed in LEADS. While it was highly unfortunate that Plaintiff had to spend several days in jail for a crime he did not commit, Zima's decision to charge him was a reasonable, not malicious decision. It was proper for a judge, not a police officer, to review the case and assess the information contained in LEADS as well as the vacating order. We therefore dismiss Plaintiff's malicious prosecution claim because no reasonable trier of fact could find that Zima was motivated by malice.

## V. Punitive damages

Punitive damages are available even without actual loss upon a showing of aggravating circumstances, malicious intent, or conduct involving reckless or callous indifference to a plaintiff's rights. *Sahagian v. Dickey*, 827 F.2d 90, 100 (7th Cir. 1987). To be entitled to punitive damages, unlawful conduct must warrant such an award to punish the wrongdoer and deter others. *Merriweather v. Family Dollar Stores of Indiana*, 103 F.3d 576, 582 (7th Cir. 1996). Punitive damages are available in Section 1983 cases only upon showing the court evil motive and intent or "reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S. Ct. 1625, 1640 (1983).

Based on the facts, no reasonable trier of fact could find that Zima engaged in reckless or callous indifference to Plaintiff's rights. As discussed, Zima was entitled to rely on LEADS and the surrounding facts in making a probable cause determination, despite Plaintiff's claims of innocence and the faxed order, both at the time of arrest and processing. His decision to arrest and charge Plaintiff with violating an order of protection was therefore neither reckless, nor callously indifferent, to Plaintiff's rights. Not only was it reasonable for Zima to rely on LEADS and the surrounding facts when deciding to arrest Plaintiff, but it was also reasonable for him to process and detain Plaintiff until a judge could determine the authenticity of the conflicting documentation. Although this unfortunately meant that Plaintiff served time in jail and wore a GPS monitoring device thereafter, Zima did not act recklessly or with callous indifference when evaluating the information before him and deciding that not only was there probable cause to arrest, but there was also probable cause to file the charging document. Since we find that Zima did not act recklessly or with callous indifference, we also add that no trier of fact could find that Zima's conduct was based upon evil motive or intent. Plaintiff therefore cannot sustain a claim for punitive damages, which we hereby dismiss.

Because we find that neither Zima nor, under the doctrine of respondeat superior, the Village of Justice, infringed on Plaintiff's rights under federal or state law, we need not address their arguments as to qualified immunity.

## CONCLUSION

"The Constitution does not guarantee that the police will never blunder when making arrests, but it establishes certain procedures to ensure that most mistakes will be detected and rectified." *Brady*, 187 F.3d at 117. Like the First Circuit in *Brady*, we also find that "[t]hose

mechanisms worked in this case." *Id*.  Plaintiff was taken before a judge at the earliest

opportunity, released, and ultimately acquitted.  We conclude this opinion with the following:

> While we are mindful of the indignities that accompany arrest and subsequent detainment, we are also mindful of the dangers inherent in tipping the delicate constitutional balance that separates the functions assigned to different departments of government.  Far from eliminating errors, imposing liability on police officers for honest mistakes of this kind . . . not only would have a detrimental impact on effective law enforcement, but also would threaten the separation of functions that our constitutional system has deployed as a means of minimizing the occurrence (and mitigating the adverse effects) of those very errors.

*Id*.  We uphold the separation of functions between law enforcement and the judiciary necessary

to minimize the occurrence of the very error Plaintiff regrettably experienced.  For all of the

reasons discussed above, Zima and the Village of Justice are not liable for any of Plaintiff's

claims.  We therefore grant the Defendants' motion for summary judgment in its entirety.

It is so ordered.

*Marvin E Esper*

U.S. District Court Judge

Date: May 28, 2014